UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Firstcom, Inc.,

        Plaintiff,

v.

Qwest Corporation,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 04-995 ADM/JJG

_____

David E. Wandling, Esq., Wandling Law Group, LLC, Minneapolis, MN, argued for and on behalf of Plaintiff.

Marianne D. Short, Esq., and Theresa M. Bevilacqua, Esq., Dorsey & Whitney LLP, Minneapolis, MN, argued for and on behalf of Defendant.

_____

## I. INTRODUCTION

On July 26, 2006, oral argument before the undersigned United States District Judge was heard on Defendant Qwest Corporation's ("Qwest") Motion for Summary Judgment [Docket No. 122] and Plaintiff Firstcom, Inc.'s ("Firstcom") Motion for Partial Summary Judgment [Docket No. 125]. In its Amended Complaint [Docket No. 14], Firstcom alleges Qwest violated the Federal and Minnesota Telecommunications Acts. Firstcom also alleges claims of promissory estoppel and fraudulent misrepresentation. For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted, and Plaintiff's Motion for Partial Summary Judgment is denied. Additionally, Defendant's Appeal of Magistrate Judge Decision [Docket No. 129] is denied.

## II. BACKGROUND

In an Order dated October 13, 2004 [Docket No. 23], the Court discussed the allegations and the factual underpinnings of this case. For purposes of background, those facts are

incorporated here, along with the following relevant facts.

In 1994, Firstcom was first granted a certificate of operating authority to provide interexchange telecommunication services in Minnesota, as well as a certificate of authority to offer Centron local exchange services on a resale basis in Qwest's exchanges. Bevilacqua Decl. [Docket No. 134] Ex. 5. In late 1999, Firstcom decided to merge with Enhanced Office Communications ("EOC"). A few months later, in February 2000, Firstcom issued a private placement memorandum describing the amount of shares to be offered for sale by the company. Private Placement Memorandum (Bevilacqua Decl. Ex. 8).

Michael Corcoran ("Corcoran"), a former shareholder, officer, and director of Firstcom, admitted that raising the capital outlined in the private placement memorandum proved more difficult than anticipated, in part because of the slowdown in the technology sector in 2000. Corcoran Dep. (Bevilacqua Decl. Ex. 9) at 77–78. The offering did not close until the summer of 2000, with Firstcom raising the minimum number of shares to complete the transaction. Id. at 125; Bevilacqua Decl. Ex 12. During board meetings held in the fall of 2000, Firstcom began planning strategies to conserve capital. Id. Ex. 14 at 3. By January 2001, Firstcom was experiencing serious financial difficulties. Id. Ex. 19 at 5–6. Firstcom determined that it must find a purchaser for the company. Id. Ex. 20 at 2, Ex. 21 at 2.

When it failed to locate a buyer, Firstcom's Board of Directors decided to sell the assets of Firstcom and dissolve the company. DeBacker Dep. (Bevilacqua Decl. Ex. 10) at 84, 90–91; Bevilacqua Decl. Ex. 24. Al Jaffe & Associates, Inc. ("AJA"), a company holding stock in Firstcom, offered to purchase Firstcom's assets and to assume outstanding liabilities on May 22, 2001. Bevilacqua Decl. Ex. 25. The Board of Directors issued a notice to shareholders on June

7, 2001, containing two resolutions, one to sell the assets of Firstcom to AJA, and the second to dissolve the corporation.  Id. Ex. 26.  Specifically, the proposed resolutions stated:

> Resolution #1.  Sale of Assets.  Resolved, that the stockholders approve, under Minn. Stat. §302A.661, subd. 2, the sale and transfer of assets of the Corporation as recommended by the Board of Directors under the AJA proposal described in the June 7, 2001 letter from William DeBacker to stockholders . . . .
>
> Resolution #2.  Voluntary dissolution.  Resolved, that the stockholders authorize, under Minn. Stat. §302A.721, the voluntary dissolution of the Corporation pursuant to Minnesota law . . . .

Id.

On June 13, 2001, a special meeting of Firstcom shareholders was held to address the two resolutions.  Id. Exs. 26, 28.  Three of the shareholders named in the Amended Complaint attended this meeting, including Robert Bussen ("Bussen"), James Nichols ("Nichols"), and Patrick O'Halloran ("O'Halloran").  Id. Exs. 27–28.  Additionally, these shareholders held proxies for several other persons named in the Amended Complaint.  However, Bussen, Nichols, and O'Halloran left the shareholder meeting before votes were taken on either resolution.  Id. Ex. 27 at 6, Ex. 28 at 3.  Votes were taken in their absence, with a majority of voting shares approving both resolutions.  Id. Ex. 28 at 3.  Firstcom thereafter sold its assets to AJA and dissolved.  Id. Ex. 29.

The Asset Purchase Agreement dated June 27, 2001, lists the assets purchased by AJA, including:

> All inventory, intellectual property rights (including trade names, trademarks, and corporate identity, including, but not limited to, Seller's interest, right and title to the name "Firstcom, Inc."), business names, customer lists, transferable warranties, telephone numbers and listings (to the extent transferable), product information (including sales and advertising materials, designs and specifications), business and customer records and lists, office and related equipment and supplies (including furniture, computers, telephone systems, and Internet/building centric equipment), customer base and existing

>Internet/building centric contracts, and building service contracts presently in place, used by Seller in the operation of Seller's Business . . . .

Asset Purchase Agreement (Bevilacqua Decl. Ex. 34) at § 1.  Additionally, the Asset Purchase Agreement transferred "certain contracts used in operation" of Firstcom's business.  Id. at § 1.2, Schedule 1.2.  The Asset Purchase Agreement retained for Firstcom only the Interconnection Agreement and UNE-P Addendum.  Id. at §§ 1.1–1.2, Schedule 1.2.  Firstcom and AJA also executed an Assignment and Assumption Agreement at the same time the Asset Purchase Agreement was signed.  The Assignment and Assumption Agreement transferred to AJA "all of Assignor's rights, title, interests, powers, remedies, benefits, options and privileges in, to and under, at law or at equity, to the Assets specifically described as being sold . . . ."  Assignment and Assumption Agreement (Bevilacqua Decl. Ex. 34).  The Asset Purchase Agreement, however, preserved Firstcom's right to receive an accounting and cash to pay outstanding accounts payable.  Asset Purchase Agreement at §§ 5.1–5.3, 5.5, 5.8.4.

The original Complaint in this action was filed in February 2004.  Qwest moved to dismiss the Complaint on the grounds that Firstcom was a dissolved corporation that lacked the capacity to maintain a suit against Qwest.  Mem. in Supp. of Mot. to Dismiss Compl. [Docket No. 4] at 5–12.  In an Order dated June 21, 2004, the Motion to Dismiss was denied, but Firstcom was ordered to amend its Complaint to state which former shareholders were maintaining the lawsuit on behalf of Firstcom.  June 21, 2004 Order [Docket No. 13] at 4, 8.

Firstcom filed an Amended Complaint [Docket No. 14] listing twelve former shareholders.  Am. Compl. ¶ 1.  The twelve former shareholders named in the Amended Complaint do not constitute a majority of Firstcom's shareholders as of June 13, 2001, the date the shareholders voted to dissolve Firstcom.  Pl.'s Resp. to Def.'s Second Req. for Admis.

(Bevilacqua Decl. Ex. 27) at 7.  Qwest again moved to dismiss [Docket No. 15], arguing that the Amended Complaint did not give sufficient information about the shareholders, such as who they were, when they owned shares, or if they were shareholders at the time Firstcom was dissolved.  Mem. in Supp. of Mot. to Dismiss Am. Compl. [Docket No. 18] at 2.  This Motion to Dismiss was denied in an October 13, 2004 Order.  The Order posed a number of questions, however, including: "[I]s Firstcom's claim solely a derivative action since § 302A.783 also allows former officers and directors to bring suit in the defunct corporation's name?  If this is a derivative claim, must Firstcom satisfy the pleading requirements for shareholder derivative actions found in Minn. Dist. Ct. Gen. Rule 23.06?  Finally, how would a successful claim affect the rights of other former shareholders or the rights of debtors whose liabilities were apparently extinguished?"  October 13, 2004 Order at 6–7.

## III. DISCUSSION

### A.   Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific

facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Defendant's Summary Judgment Motion**

Qwest first moves for summary judgment on the basis that the twelve former Firstcom shareholders named in the Amended Complaint lack standing to pursue claims on behalf of Firstcom.  As previously mentioned, the October 13, 2004 Order raised certain questions about this lawsuit.  In response, Qwest argues that the claims asserted in the Amended Complaint are solely derivative in nature, that the ongoing business operations of Firstcom and all its assets were sold to AJA immediately prior to dissolution, and finally, that the Federal Rules of Civil Procedure require that a demand be made prior to bringing a derivative suit in Firstcom's name.

Qwest avers Firstcom's claims are solely derivative in nature, and therefore, must be dismissed because the named shareholders do not have standing to maintain this lawsuit.  The October 13, 2004 Order found that the Amended Complaint "alleges an injury against the now defunct corporation that affected all shareholders equally," thus, the claims are derivative in nature.  October 13, 2004 Order at 6.  The Order, however, left open the question of whether the claims were solely derivative in nature.  Under Minnesota law, "[i]n analyzing whether a claim is direct or derivative, we look not to the theory in which the claim is couched, but instead to the injury itself."  Wessin v. Archives Corp., 592 N.W.2d 460, 464 (Minn. 1999).  In Wessin, "[t]he crux of the [plaintiffs'] complaint is the alleged misappropriation and waste of corporate assets by the majority shareholder.  These claims are traditional derivative claims that rightfully belong to the corporation.  Any damage claimed by the [plaintiffs] arises only from their status as existing shareholders." Id. at 465.

Here, the twelve named shareholders do not claim any damages distinct to them. None of the claims involve allegations that Qwest specifically harmed the named shareholders; rather, it is alleged that Qwest harmed Firstcom as a whole by destroying Firstcom's business. No injury is alleged that describes a specific injury to any individual shareholder. Therefore, this suit is properly characterized as solely a derivative action.

Next, Qwest alleges that because Firstcom sold substantially all of its assets prior to dissolving, the shareholders named in the Amended Complaint lack standing to maintain this lawsuit. Once a court has "characterized an action as direct or derivative, federal law determines whether the plaintiff has standing to maintain the lawsuit." Kona Enters. v. Estate of Bishop, 51 F. Supp. 2d 1048, 1053 (D. Haw. 1998). Additionally, Federal Rule of Civil Procedure 23.1 requires that a derivative plaintiff be a shareholder at the time of the alleged wrongful act and throughout the litigation. Fed. R. Civ. P. 23.1; Lewis v. Chiles, 719 F.2d 1044, 1047 (9th Cir. 1983). Courts have routinely held that shareholder derivative suits are intangible assets of a corporation that pass along with a sale of a corporation's assets, and only an acquiring company and its shareholders can pursue derivative claims. Lewis, 719 F.2d at 1047; see also Turner v. Officers, Dirs., and Employees of Mid Valley Bank, 712 F. Supp. 1489, 1495–98 (E.D. Wash. 1988) (failing bank's assets which were transferred to a second bank also transferred unasserted claims, resulting in no standing for former shareholders). The Eighth Circuit adopted this principle in In re Milk Prods. Antitrust Litig., 195 F.3d 430 (8th Cir. 1999). There, a plaintiff corporation that had divested itself of virtually all of its assets brought an antitrust action. The transferring documents did not discuss whether unasserted claims were sold with the corporation's assets. Because substantially all of the corporation's assets had been sold,

however, the Eighth Circuit affirmed the District Court's conclusion that the interest in the lawsuit had also been transferred. Id. at 435–36.

Here, the documents recording the sale of assets from Firstcom to AJA indicate that substantially all of Firstcom's assets were sold to AJA. There is no specific mention of the transfer of known or unknown claims. Facing a similar situation in Milk Products, the court looked to Minnesota law to determine "whether a contract is ambiguous . . . . Ambiguities are resolved by ascertaining the intent of the parties from the contract documents and relevant extrinsic evidence." Id. at 435. The Minnesota Supreme Court has identified a number of factors to be considered in determining whether a business has acquired substantially all of another corporation's assets, including:

> (1) machinery and manufacturing equipment, (2) office equipment, (3) corporate name, (4) inventories, (5) covenant not to compete, (6) possession of premises, (7) goodwill, (8) work in progress, (9) patent rights, (10) licenses, (11) trademarks, (12) trade names, (13) technical data, (14) lists of customers, (15) sales correspondence, (16) books of accounts, and/or (17) employees.

Mid-America Festivals Corp. v. Comm'r of Dep't of Econ. Sec., 349 N.W.2d 270, 274 (Minn. 1984). Although not all of these factors are applicable in the instant sale, many of them are specifically identified in the Asset Purchase Agreement, including inventory, the corporate name, customer lists, sales and advertising materials, and office and related equipment. Asset Purchase Agreement at § 1. Additionally, the Assignment and Assumption Agreement transferred to AJA "all of Assignor's rights, title, interests, powers, remedies, benefits, options and privileges in, to and under, at law or at equity, to the Assets specifically described as being sold . . . ." Assignment and Assumption Agreement. Extrinsic evidence also suggests that Firstcom intended to sell all or substantially all of its assets. The language of the two resolutions

voted on and passed at the June 13, 2001 meeting suggests that Firstcom intended to sell all its assets and immediately dissolve thereafter. Bevilacqua Decl. Ex. 26. As none of the shareholders named in the Amended Complaint were present at the time of the vote, none can offer testimony to contradict this conclusion.

Plaintiff argues that Firstcom's retention of the Interconnection Agreement and UNE-P Addendum is evidence that Firstcom intended to maintain the rights to the legal claims brought in the instant lawsuit. However, the Asset Purchase Agreement is silent as to whether Firstcom retained any rights to sue under these agreements. Asset Purchase Agreement at §§ 1.1–1.2, Schedule 1.2. In Milk Products, such silence was determined to indicate an intent to sell assets not named. 195 F.3d at 435. Additionally, as previously noted, the Assignment and Assumption Agreement encompasses "all of Assignor's rights, title, interests, powers, remedies, benefits, options and privileges in, to and under, at law or at equity, to the Assets specifically described as being sold . . .," further bolstering the argument that any rights to litigation transferred to AJA. Assignment and Assumption Agreement. Finally, there is evidence that the parties to the two agreements knew appropriate language to reserve rights to Firstcom, because a clause was inserted in the agreement to retain Firstcom's right to an accounting and cash for accounts payable. Asset Purchase Agreement at §§ 5.1–5.3, 5.5, 5.8.4. Therefore, the fact that the Interconnection Agreement and UNE-P Addendum were retained by Firstcom is not sufficient to avoid the indelible conclusion that Firstcom intended to, and did, transfer substantially all of its assets, including any rights to litigation, to AJA before dissolving.

Because Firstcom transferred all its rights to maintain this claim to AJA, the former shareholders named in this lawsuit do not have standing to maintain this lawsuit. Defendant's

9

Motion for Summary Judgment is granted.

C.  **Defendant's Remaining Arguments, Plaintiff's Motion for Partial Summary Judgment, and Appeal of Order**

Even if the named shareholders were found to have standing to bring this lawsuit, the suit would still fail because the named shareholders failed to comply with the requirements of Federal Rule of Civil Procedure 23.1, which requires plaintiffs in a derivative action to make a demand on the corporation's "directors or other comparable authority," or, in the alternative, plead why such demand would be futile. Fed. R. Civ. P. 23.1. There has been no proffer that any demand was made on Firstcom's Board of Directors. Although two of the three former board members were approached in their capacities as shareholders about participating in this lawsuit, no request was made of them in their capacity as directors that they bring an action in the name of the dissolved company. Mem. in Opp'n to Mot. for Summ. J. [Docket No. 166] at 31.

Plaintiff argues that the strictures of Rule 23.1 do not apply to this lawsuit because Plaintiff is suing under Minn. Stat. § 302A.783, which allows former shareholders to assert claims in the name of a dissolved corporation. This argument, however, is unavailing in light of the conclusion that the named shareholders are pursuing a solely derivative action. They are therefore bound by the Federal Rules of Civil Procedure, including Rule 23.1.

Plaintiff argues in the alternative that demand should be excused because it would have been futile. Plaintiff points to the fact that Firstcom, as a dissolved corporation, has no board of directors. Rule 23.1, however, requires that demand be made on the "directors or *other comparable authority*." Fed. R. Civ. P. 23.1 (emphasis added). Assuming arguendo that no demand could be made on the directors, "other comparable authority" would be the former

shareholders. Since the named shareholders failed to enlist a majority of the former Firstcom shareholders in this lawsuit, "other comparable authority" rejected the demand. Plaintiff has made no proffer that the former shareholders or directors who declined to participate in this lawsuit did so for improper reasons. Therefore Plaintiff cannot support its assertion that demand was futile. Because the named shareholders failed to make a sufficient demand on Firstcom's board of directors, or, alternatively, because the named shareholders failed to show why demand on the former directors or shareholders was futile, this suit must be dismissed pursuant to Rule 23.1.

Because the named shareholders do not have standing to maintain this suit and because they have failed to meet the requirements of Rule 23.1, the substantive merits of Defendant's and Plaintiff's Motions need not be reached, nor must the Appeal of Magistrate Judge Graham's Order be considered. The remainder of Defendant's Motion, along with Plaintiff's Motion and the Appeal, are therefore denied as moot.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Qwest Corporation's Motion for Summary Judgment [Docket No. 122] is **GRANTED**;

2. Plaintiff Firstcom, Inc.'s Motion for Partial Summary Judgment [Docket No. 125] is **DENIED**; and

3. Defendant's Appeal of Magistrate Judge Decision [Docket No. 129] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 18, 2006.